UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X

LORENA ABARZA RIOS, on behalf of herself and all
others similarly situated,

                          Plaintiff,

                -against-

SPIRIT PHARMACEUTICALS LLC,

                        Defendant.

------------------------------------------------------------------- X

**No. 2:23 Civ. 3637 (GRB) (JMW)**

### AFFIDAVIT OF LOUIS PECHMAN IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT AND CONDITIONAL CERTIFICATION OF SETTLEMENT CLASS

I, Louis Pechman, under penalty of perjury, affirm as follows:

1.      I am the principal attorney at Pechman Law Group PLLC ("PLG") in New York, New York. Along with Galen C. Baynes, a partner at PLG, and Camille A. Sanchez, an associate at PLG, I am one of the attorneys primarily responsible for prosecuting the claims of Plaintiff Lorena Abarza Rios on behalf of herself and the putative Class in the above matter.

2.      I am personally familiar with the facts and circumstances discussed below and in the attached exhibits.

3.      I submit this affidavit in support of Plaintiff's Unopposed Motion for Preliminary Approval of the Class Action Settlement and Conditional Certification of Settlement Class (the "Motion for Preliminary Approval").[1]

---

[1] Unless otherwise defined, all capitalized terms and abbreviations used in this Affidavit have the meanings assigned to them here or in the Parties' Settlement Agreement and Release (the "Settlement" or "Agreement") attached as Exhibit 1. All exhibits to the Agreement are referenced here and in the accompanying Memorandum by the prefix "Ex." and the letter designated to them in the Agreement.

**PROCEDURAL BACKGROUND**

**Background and Initial Proceedings**

4.      Plaintiff was employed by Defendant Spirit Pharmaceuticals LLC ("Defendant") as a machine operator at Defendant's Ronkonkoma, New York facility from approximately July 13, 2019, through January 4, 2023. Complaint, ECF No. 1 ¶¶ 6-7.[2]

5.      Defendant is a pharmaceutical company that manufactures, markets, and distributes over-the-counter drug products. *Id.* ¶¶ 7-8.

6.      Plaintiff commenced this putative Fair Labor Standards Act ("FLSA") Collective and Federal Rule of Civil Procedure 23 ("Rule 23") Class Action (the "Action") on May 16, 2023, on behalf of herself and all similarly situated non-managerial facility workers. *See generally id.*

7.       Through her Complaint, Plaintiff alleged claims against Defendant for: (1) unpaid minimum wages under the New York Labor Law § 190 *et seq.* ("NYLL") (Claim I); (2) unpaid overtime wages under the FLSA, 29 U.S.C. § 201 *et seq.*, and NYLL (Claims II and III); (2) unpaid "spread-of-hours" pay under the NYLL (Claim IV); (3) frequency of pay violations under NYLL § 191 (Claim V); and (4) violations of the NYLL's Wage Theft Prevention Act ("WTPA") for failure to provide accurate wage statements and wage notices. *See id.* ¶¶ 54-88.

8.      Specifically, Plaintiff alleged that she and other non-managerial facility workers regularly worked over forty hours per workweek but were paid at "straight-time" rates (*i.e.*, the same regular hourly rate) for all hours worked over forty per workweek, and therefore were not paid required overtime premiums for overtime hours worked. *See id.* ¶¶ 16-23.  Plaintiff further alleged that she and other non-managerial facility workers were not paid spread-of-hours pay when they worked shifts spanning in excess of ten hours and were not provided with wage notices at their

---

[2] References to "ECF" are to the Court's Electronic Case File system and docket in the Action.

time of hire or when their wage rates changed or with accurate wage statements with each payment of wages. *Id.* ¶¶ 24, 31-32.

9.      Plaintiff further alleged that Defendant did not pay wages for overtime hours by payroll check, but instead paid wages for overtime shifts by separate checks. *Id.* ¶ 29.

10.     Plaintiff additionally alleged that she and other non-managerial facility workers were "manual workers" who spent more than 25% of their work time performing duties that were physical in nature and at points were paid their wages on a bi-weekly basis, such that the wages were paid more than seven days after the end of the workweek in which they were earned. *Id.* ¶¶ 30, 84-88.

11.     Plaintiff asserted her claims arising under the FLSA on a collective action basis and her claims arising under the NYLL on a Rule 23 Class basis. *Id.* ¶¶ 33-53.

12.     Defendant filed its Answer on July 13, 2023, generally denying the material allegations of the Complaint.  Answer, ECF No. 11.

13.     The Court held an initial pre-trial conference on September 8, 2023, and entered an Order scheduling the completion of discovery by March 29, 2024.  *See* ECF No. 17.

**Collective Notice, Opt-In Proceedings, and Discovery**

14.     On October 2, 2023, Plaintiff's counsel served Plaintiff's first set of document requests and first set of interrogatories to Defendant.

15.     On November 3, 2023, the Parties stipulated to the conditional certification of a 29 U.S.C. § 216(b) FLSA collective action consisting of all non-managerial facility employees who worked for Spirit Pharmaceuticals at any time since May 16, 2020 to the present (the "Collective Stipulation").  ECF No. 19.

16.     The Court entered the Parties' Collective Stipulation and conditionally certified the

FLSA Collective action and approved the Parties' proposed FLSA Notice on November 6, 2023.
ECF No. 20.

17.     Per the procedures set forth in the Collective Certification, Defendants produced an
Excel list containing contact information for 985 non-managerial employees who had been
employed by Defendant within the three years prior to the commencement of the Action on
December 4, 2023.

18.     On January 18, 2024, the Parties submitted a joint status letter requesting an
extension of discovery deadlines originally scheduled as the Parties proceeded with the FLSA
Collective notice procedures, ECF No. 45, which was granted by the Court on January 19, 2024

19.     In January 2024, Plaintiff's counsel mailed the Collective Notice and Consent to
Sue forms to the 985 employees on the Collective List.

20.     As a result of the Notice mailing, 97 individuals returned Consent to Sue forms and
joined the Action as Opt-In Plaintiffs: Rosa Picon Shitumul, Ruth Reyes Amaya, Leyla Hernandez,
Cesia Aguilar, Gloria Sorto de Salvador, Julio Cesar Cornejo, Orfa Carranza, Rosa Alfaro, Javier
Rios, Nelson Torres Alfaro, Alvaro Alonso Soto Castro, Daisy Bartolina Gomez de Roa, Tomas
Soto Caroca, Vladimir Soto Mancilla, Roxana Bazan, Orbelina Guardado, Maria Margarita Juarez
Hernandez, Luis Donoso, Darlyng Calix Flores, Felipe Mora Guajardo, Vicente Alonso Soto
Caroca, Jissenia Larissa Vasquez Cano, Nixi Gomez Aguirre, Idalia Galeas, Miryam Villatoro,
Maynor Figueroa, Jose Fernando Balestegui, Armando Armijos, Guillermo Gonzalez, Lucia
Pajares, Osmel Romero, Paola Pajares, Raul Cruz, Sandra Gonzalez, Abu Rahman, Sabina Banu,
Elmer Benjamin Guzman, Fnu Mehak, Jose Hernandez, Junior Martinez, Maria Pajares, Marilu
Cisneros, Miguel Hernandez, Silvia Gomnez, Marlon Martinez, Ana Martinez, Most Sheuly Aktar,
Erika Arteagau, Luis Santamaria, Maria Serrano, Romana Raymundo, Yessica Baquedano,

Florentin Caballero, Aralicia Melendez, Ever Castellon, Jinat Ana, Juio Cesar Garcia Moreno, Mesba Ahmed, Ana Beraliz Romero de Guevara, Heydis Steffany Saravia, Irma Martinez, Joshua Cohen, Jonathan Cordova, Jhon Martinez, Keiry Vasquez, Kenia Aracely Vasquez Aguilar, Govana Luna, Korshida Begum, Md Ershad Alam, Syeda Sultana, Nestor Patino, Kevin Nunez, Niyati Kapadia, Sofia Salazar, Yessenia Allain, Maria Mendez Fuentes, Aracely Castro, Alexis Ramos, Evelyn Castillo, Brandon Cachin, Dora Cornejo, Luis Beltran, Gladis Hernandez, Blanca Tigre Bonilla, Olga Yolanda Chavarria, Olga Swana Donis, Milagro Vasquez, Maria Romero, Xiomara Cabrera, Jorge Jaccome, Jenny Frias, Rocio Arce, Ivan Castillo Rodriguez, Monica Maldonado, Carlos Portillo, Yenny Sarmiento, Norvis Bonilla.

21.    Plaintiff's counsel held interviews with approximately 62 of the Opt-In Plaintiffs to gather relevant information about their work with Defendant and wage and hour claims and to request relevant documentation where available.

22.    Counsel for the Parties engaged in discussions on appropriate discovery methods given the large number of Opt-In Plaintiffs that joined the Action.  As a result of these discussions, the Parties agreed to the selection of a sampling of twenty representative Opt-In Plaintiffs and agreed to the exchange of time and payroll records for these twenty Opt-In Plaintiffs to analyze liability and aid in collective and class-wide settlement discussions.

23.    Defendant produced time and payroll records for the twenty Opt-In Plaintiffs to Plaintiff's counsel on April 17, 2024.

24.    The Parties informed the Court of the same on April 19, 2024.  *See* ECF No. 117.

25.    The time and payroll records produced by Defendant were comprised of payroll records from two payroll providers utilized by Defendant and punch clock records for the representative Opt-In Plaintiffs.  The production also included purported wage notices signed by

Plaintiff and the Opt-In Plaintiffs and wage statements reflecting wages paid through Defendant's standard payroll providers. The production totaled approximately 4,000 pages.

26.    Plaintiff's counsel reviewed the 4,000 pages of time and payroll records and consulted with Plaintiff about the same.

27.    With Plaintiff's assistance, Plaintiff's counsel determined that there were certain gaps in the records for pre-January 2021 periods and with regard to alleged wage payments made to Plaintiff and Opt-Ins by methods other than Defendant's standard payroll distributions, including non-payroll checks and gift cards.

28.    Plaintiff's counsel raised the discovery issue with Defendant's counsel and produced records maintained by Plaintiff that reflected non-payroll payment. However, Defendant informed that Defendant had produced all relevant records in its possession and that its former payroll provider was not cooperating with requests for additional documentation.

29.    Plaintiff's counsel issued a third-party subpoena to Paycom commanding the production of pre-January 2021 payroll records for the applicable Opt-In Plaintiffs on August 8, 2024, to which Paycom responded with a production.

30.    Other than a limited number of documents maintained by Plaintiff and the Opt-In Plaintiffs of payments for alleged off-the-clock hours worked, the discovery productions in the Action did not reflect alleged wage payments made to Plaintiff and Opt-In Plaintiffs by methods other than Defendant's standard payroll distributions.

31.    The Parties continued to engage in discussions regarding a class-wide mediation and agreed to participate in a private mediation before Mediator Martin Scheinman, Esq.

32.    Defendant produced a list of 1,156 non-managerial employees who had worked for Defendant at its Ronkonkoma, New York facility any time between May 16, 2017 and October

25, 2023.

33.     The Parties informed the Court of their agreement to participate in a private mediation on May 31, 2024, resulting in a stay of further discovery deadlines pending the outcome of the mediation.  *See* ECF No. 122.

**Article 9 Foreclosure, Settlement Negotiations, and Mediation**

34.     In preparation for the mediation, Plaintiff's counsel analyzed all available time and payroll records, engaged in discussions with Plaintiff, and interviewed and reviewed information provided by approximately 62 Opt-In Plaintiffs.

35.     Because of the alleged off-the-clock overtime hours (*i.e.*, hours for which no punch records or payroll were available), documentation directly evidencing overtime hours worked and pay received by the Class Members was extremely limited.

36.      Plaintiff's counsel drafted damages on a class-wide basis in anticipation of the mediation.  For purposes of the damages calculations and based on the available documentary evidence and information received from Plaintiff and the Opt-In Plaintiffs, Plaintiff's counsel assumed class members regularly worked eight hours of overtime per week for settlement purposes, and calculated overtime damages this average number of weekly overtime hours by the number of weeks worked by individual Class Members in the liability period, a contention which was disputed by Defendant.

37.     Plaintiff's counsel provided the damages calculations for settlement purposes to Defendant's Counsel on September 10, 2024.  The following table provides a summary of the total alleged Class damages as calculated by Plaintiff's counsel for settlement purposes:[3]

---

[3] As the available record evidence reflected infrequent spread-of-hours shifts, spread-of-hours damages were not included in the damages calculations.

| Unpaid Overtime Wages (FLSA & NYLL) | $3,282,112 |
| Liquidated Damages (NYLL) | $3,282,112 |
| NYLL ¶ 191 Frequency of Pay Damages | $23,079,936 |
| NYLL § 195(1) Damages (WTPA Notices) | $3,700,450 |
| NYLL § 195(3) Damages (WTPA Paystubs) | $4,765,500 |
| **Total Alleged Damages:** | **$38,110,110** |

38.    On September 17, 2024, Defendant requested a pre-mediation audience before Mediator Scheinman to discuss developing circumstances that would impact the prospects of settlement.

39.    During a conference call with Mediator Scheinman on September 18, 2024, Defendant's counsel advised (i) Defendant's owners had been relieved of their duties; (ii) a Chief Restructuring Officer with management authority over Defendant's affairs had been installed; (iii) Defendant's senior secured lender had begun efforts towards an Article 9 Foreclosure transaction to recover on the approximately $13 million in debt owed by Defendant, and that the transaction's closure would leave Defendant with no assets; and (iv) SC&H Capital had been retained to conduct an Article 9 auction.

40.    Defendant's counsel further advised that neither Article 9 foreclosure transaction nor a direct foreclosure by the senior secured lender on Defendant's assets would satisfy Defendant's debt to the senior secured lender in full and that while a purchaser of the senior secured lender's collateral had been identified following an auction, the viability of the Article 9 Foreclosure transaction was dependent in part on the resolution of the claims in the instant Action to resolve concerns with potential successor liability.

41.    Plaintiff's counsel requested documentation confirming the underlying financial circumstances and foreclosure proceedings confronted by Defendant.

42.    The Parties negotiated a Stipulation for the Production of Highly Confidential

Attorney's-Eyes-Only Information, which was filed on September 20, 2024. *See* ECF No. 127. Defendant then produced documentation confirming Defendant's debt to its senior secured creditor and the status of the ongoing proceedings in the Article 9 Foreclosure sale.

43.     The Parties and Mediator Scheinman agreed to reschedule the mediation that had previously been scheduled for October 1 to September 23, 2024, due to the pending anticipated closing deadline for the Article 9 Foreclosure sale.

44.     On September 21, 2024, counsel for the Parties, the Chief Restructuring Officer, and counsel in the foreclosure proceedings held a conference about the Article 9 Foreclosure and prospects of settlement given that any such settlement would only be viable if it resulted in an agreement by Defendant's senior secured creditor to execute the Article 9 Foreclosure sale as opposed to foreclosing directly on Defendant's assets.

45.     On September 23, 2024, counsel for the Parties, representatives of SC&H, and counsel in the foreclosure proceedings participated in a mediation before Mediator Scheinman.

46.     As a result of the mediation, the Parties reached a settlement in principle for the total sum of $1.5 million to resolve the Action on a class basis, contingent on the closure of the Article 9 Foreclosure sale and transfer of the sale proceeds reserved for resolution of the Action (the "Settlement Amount") to a third-party escrow account maintained by Arden Claims Service LLC ("Arden").

47.     The Parties thereafter prepared and executed a written Settlement Agreement, attached to this affidavit as Exhibit 1, memorializing the full settlement terms.

48.     On November 6, 2024, Defendant confirmed the transfer of the Settlement Amount to Arden coincident with the closure of the Article 9 Foreclosure transaction, satisfying the contingency for the Parties' Agreement to become effective.

49.    As a result of the closing of the Article 9 Foreclosure transaction, Defendant's assets have been liquidated, and Defendant is dissolving. *See* Ex. 2 (Article 9 Foreclosure Notice).

**THE PROPOSED SETTLEMENT TERMS AND STRUCTURE**

50.    The Settlement provides for full resolution of Plaintiff's and the Class Members' claims under the FLSA and NYLL in exchange for payment of the total Settlement Amount of $1,500,000 (One Million Five Hundred Thousand Dollars). The principal terms of the Settlement are as follows:

a. **Settlement Amount**:  To satisfy the Condition Precedent requiring that the Settlement Amount be deposited into the Qualified Settlement Fund ("QSF") within five days of the Article 9 Foreclosure sale, the Settlement Amount of $1,500,000 has been deposited to the QSF maintained by putative Claims Administrator Arden Claims Service LLC.  Ex. 1 §§ 1.33, 2.2;

b. **Class Members**:  Class Members are Plaintiff, the Opt-In Plaintiffs, and all non-managerial employees who worked for Spirit Pharmaceuticals LLC at any time between May 16, 2017 and October 25, 2023. Ex. 1 §§ 1.7;

c. **Net Settlement Fund**:  The Net Settlement Fund is equal to the Settlement Amount after deductions for: (1) the Claims Administrator's fees and costs; (2) Court-approved attorneys' fees and costs for Class Counsel; and (3) the Court-approved Service Award to Plaintiff.  The Net Settlement Fund is inclusive of any applicable employer FICA withholdings on Class Members' Individual Settlement Shares as set forth in this Agreement. Ex. 1 § 1.21;

d. **Claims Administrator**: Subject to the Court's approval, Claims Administrator, Arden Claims Service LLC will, *inter alia*, mail, email, and text Notices to Class Members; perform a skip trace for any Class Members for whom a Notice is returned as undeliverable and attempt a remailing; track returned and undeliverable Notices, objections, and Opt-Out Statements; create and manage the Qualified Settlement Fund ("QSF") as required by the Settlement Agreement and Release; issue and mail Settlement Checks with required tax documents to Rule 23 Class Members; monitor the cashing of Settlement Checks; and communicate with Class Members, Class Counsel and Defendant's Counsel concerning the administration of the Settlement. Ex. 1 §§ 2.3, 2.6.

e. **Mailing of Notice Materials**: Within ten days of the Court's entry of the Preliminary Approval Order, Defendant will provide the Claims Administrator with a list containing all available contact information for the Class Members.  The Claims Administrator will mail, email, and text (where available) the class notice to all Class

Members within fifteen days of Defendant's provision of the Class Member list to the Claims Administrator. Ex. 1 § 2.6

f.   **Service Award to Plaintiff**: For her contributions to and participation in the Action, the Parties propose that Plaintiff Lorena Abarza Rios receive a service award of $20,000, from the QSF. Ex. 1 § 3.3

g.   **Claims Administrator's Fees**: The Claims Administrator's fees and expenses are to be paid out of the QSF. The Claims Administrator has quoted administration services fees and costs of $38,000.00. Ex. 1 § 3.1(A); Ex. 3 (Arden Administration Quote)

h.   **Class Counsel's Fees and Costs**: Class Counsel will request fees in the amount of 33.33% of the Settlement Payment (*i.e.*, $500,000), which amount shall be inclusive of reimbursement of Class Counsel's actual litigation expenses and costs, to be paid from the QSF. Ex. 1 § 3.2.

i.   **Individual Class Member Settlement Shares**: Each Participating Class Member shall receive a percentage of the Net Settlement Fund as calculated pursuant to the following formula: (i) compute the total number of weeks worked by Participating Class Members throughout the Liability Period ("Workweeks"); (ii) divide the Net Settlement Fund by the Workweeks to determine the weekly allocation of the Net Settlement Fund (the "Weekly Allocation"); (iii) for each Participating Class Member, multiply the Weekly Allocation by the total number of weeks, including partial weeks rounded to the nearest tenth place, worked by that Participating Class Member during the Liability Period to compute each Participating Class Member's Individual Settlement Share of the Net Settlement Fund. Any Participating Class Member who worked for Defendant for at least one day but less than one week during the Liability Period shall be credited with one full Workweek for purposes of these calculations. Ex. 1 § 3.4;

j.   **Participating Class Members**: Participating Class Members are all Class Members who do not submit a valid Opt-Out Statement. Ex. 1 § 1.26

k.   **Rule 23 Class Release**: In exchange for their receipt of a Settlement Check, Participating Class Members release the Releasees from any and all wage and hour claims under the New York Labor Law brought or which could have been brought in the Action, including but not limited to minimum wages, overtime pay, spread-of-hours pay, liquidated damages arising from frequency of pay violations under NYLL § 191, liquidated damages under NYLL § 198, any claims for penalties under NYLL § 195, and related attorneys' fees and costs. Ex. 1 § 4.1(A).

l.   **FLSA Release**: In exchange for cashing their Settlement Checks, Participating Class Members become FLSA Collective Members and thereby opt-in to this Action and release the Releasees from any and all wage and hour claims under the Fair Labor Standards Act brought or which could have been brought in the Action, including but not limited to minimum wages, overtime pay, liquidated damages, statutory damages,

11

any claims for penalties, and related attorneys' fees and costs.  Ex. 1 § 2.10(B); 4.1(B).

m. **Reversion & Taxes**: Participating Class Members will have three hundred sixty-five (365) days from the date of the mailing of the Settlement Checks to cash their Settlement Checks (the "Acceptance Period").  Upon expiration of the Acceptance Period, the Settlement Claims Administrator shall return any unclaimed amounts left in the QSF to Defendant's Designee. Settlement Checks paid to Participating Class Members will be allocated 10% to W-2 wage payments and 90% to 1099 non-wage payments for interest, liquidated damages, and statutory penalties. Ex. 1 §§ 3.1(D-E), 3.5(A)

## CONDITIONAL CLASS CERTIFICATION AND
## PRELIMINARY SETTLEMENT APPROVAL

51.     Although notice of the Settlement has not yet been issued, the Parties support the Settlement and believe that it is a fair and reasonable resolution of the claims in this Action on a class basis.

52.     Plaintiff is an adequate representative of the proposed Class and has provided valuable input to PLG throughout the Action to aid in prosecuting the claims.  Plaintiff shares the same claims and suffered the same injuries as the Class Members, has fairly and adequately represented and protected the interests of all putative Class Members, and does not have any interests that are antagonistic to the interests of the Class.

53.     Plaintiff has played an important role in the prosecution of the Action by, *inter alia*: (1) consulting with PLG and providing documentation for PLG's investigation of the wage and hour claims, including documentation regarding alleged wages paid for off-the-clock overtime hours worked; (2) communicating with current and former coworkers at Spirit Pharmaceuticals to advise them about the option to join the Action as Opt-In Plaintiffs; (3) keeping PLG apprised of issues that Plaintiff became aware of through former coworkers regarding Defendant's operations during the course of the Action; (4) consulting with and assisting PLG in the analysis of payroll and time records produced in discovery; and (5) consulting with and assisting PLG in the

negotiation of the Settlement.  Plaintiff shouldered the risks of being the sole named Plaintiff in this Action and was instrumental in assisting with PLG's prosecution of the case and successful negotiation of a Settlement that will provide significant recovery to the Class despite the Article 9 Foreclosure and Defendant's liquidation.

54.     PLG is not aware of any pendant wage and hour litigation by non-managerial employees against Defendant.  Based on information provided by Defendant, approximately 500 of the putative Class Members worked for Defendant for ten weeks or less during the Liability Period.

55.     The proposed Settlement Notice, attached to the Agreement as Ex. A, satisfies the clear, concise, and easily understood language requirements of Federal Rule of Civil Procedure 23. It will be distributed in English and Spanish, and explains to each Class Member in plain language: the nature of the Action and Settlement and the claims and disputed issues; Ex. A §§ 1,2; the Settlement Amount; *id.* § 3; the basis of the Individual Settlement Amounts and how they will be calculated; *id.* § 4; how to opt-out of the Class Settlement; *id.* § 8; the rights that will be waived in exchange for opting out or remaining in the class and/or doing nothing and opting in as an FLSA Collective member in exchange for endorsing a Settlement Check; *id.* § 6; and how to object to the Settlement, *id.* § 9. The Settlement Notice also makes clear that Class Counsel will seek recovery of attorneys' fees and costs equivalent to one-third of the Settlement Amount. *Id.* § 4.

56.     The Notice is the best and most practicable method of notifying the Class Members of the proposed Settlement. Within ten days of the Court's entry of the Preliminary Approval Order, Defendant will provide the Claims Administrator with a list of each Class Member's name, social security number, and last known mailing address, email address, and telephone number.  Ex.

1 § 2.6(A). Thereafter, the Claims Administrator will distribute the Notice in English and Spanish by first class mail, email, and SMS text message where available to all Class Members. *Id.* § 2.6(B). The Claims Administrator will also take reasonable steps to obtain the correct address for Class Members for whom a Notice is returned by the post office as undeliverable and attempt a remailing. *Id.* § 2.6(C)

57. Attached as Exhibit 4 is a proposed Order: (1) granting preliminary approval of the Settlement; (2) conditionally certifying, for settlement purposes only, the NYLL class under FRCP 23; (3) appointing Plaintiff as Class Representative; (4) appointing PLG as Class Representative; (5) appointing Arden Claims Service LLC as Claims Administrator; (6) approving the Notice; (7) ordering the Claims Administrator to disseminate the Notice to Class Members; (8) setting deadlines for the receipt of opt-out statements and objections from Class Members, if any; and (9) setting a deadline for the filing of a motion for final approval and scheduling a Final Approval Hearing date.

## BACKGROUND AND EXPERIENCE OF CLASS COUNSEL

58. PLG specializes in representing both workers and businesses in workplace disputes. We have advocated for bussers and construction workers as well as corporate executives and Fortune 500 companies. Our experience with and ability to see all the angles of a dispute has earned us a reputation for resolving difficult cases.

59. PLG has expended substantial time and effort litigating this Action from inception through Settlement, including by, *inter alia*: (i) consulting with Plaintiff and investigating the claims; (ii) engaging in discovery; (iii) negotiating a stipulation for the conditional certification of an FLSA collective, which was approved by the Court; (iv) managing the FLSA notice and opt-in procedures, which resulted in 97 Opt-In Plaintiffs joining the Action; (v) reviewing thousands of

payroll records and interviewing approximately 62 Opt-In Plaintiffs to analyze the class claims; and (vi) negotiating the proposed Settlement that will permit Plaintiff and the Class Members a significant recovery despite Article 9 Foreclosure transaction and the liquidation of Defendant's assets.

60.     PLG meets all relevant criteria for appointment as class counsel under Rule 23.  The firm has done substantial work identifying, investigating, prosecuting, and settling the claims; has substantial experience prosecuting and settling wage-and-hour actions, including class actions; is well-versed in wage-and-hour and class action law; and is well-qualified to represent the interests of the Class Members.  PLG is committed to spending time and resources and to ensuring the final resolution of the Action and to date has expended significant resources in prosecuting the claims.

61.     Since graduating from Fordham Law School in 1983, I have specialized in labor and employment law.  I was an attorney at Skadden, Arps, Slate, Meagher & Flom LLP; Vladeck, Waldman, Elias & Engelhard, P.C.; the Daily News; and Lambos & Giardino/Lambos & Junge. From 1996 through 2014, I was a partner at Berke-Weiss & Pechman LLP, the predecessor firm to PLG.  On January 1, 2015, I founded PLG.

62.     I am licensed to practice law in the State of New York and am admitted in all United States District Courts of New York, as well as the Second Circuit Court of Appeals.  I am also licensed to practice in the State of New Jersey and am admitted in the United States District Court for the District of New Jersey.

63.     I have handled over 300 wage-and-hour cases, representing both employees and employers, including Fortune 500 corporations.  *See Sajvin v. Singh Farm*, No. 17-cv-4032, 2018 WL 4214335, at *9 (E.D.N.Y. Aug. 13, 2018) (noting that "Pechman's experience, expertise, and reputation in this District [warranted] an award slightly above the current stagnant hourly rate")

(Reyes, M.J.)  I have also been appointed class counsel or counsel for FLSA collective classes in several wage-and-hour cases.  *See, e.g., Demirkaya v. Haven Riverfront Restaurant and Bar LLC, et al.*, No. 21 Civ. 13841 (D.N.J. 2023) (appointment, PLG, including Louis Pechman and Vivianna Morales as class counsel and approving settlement); *Moran v. JLJ IV Enters., Inc.*, No. 651136/2019, at *1 (Sup. Ct., N.Y. Co. June 16, 2020) (granting disputed motion for class action certification and appointing PLG, including Louis Pechman as class counsel); *Soriano v. D&J Export, Inc.*, No. 18 Civ. 194 (E.D.N.Y. 2019) (appointing PLG, including Louis Pechman as class counsel and approving settlement); *Manley v. Midan Rest., Inc.*, No. 14 Civ. 1693, 2017 WL 1155916, at *9 (S.D.N.Y. Mar. 27, 2017) ("Louis Pechman and the Pechman Law Group have significant experience representing both employers and employees in wage and hour actions in this District. . . . Louis Pechman has an excellent reputation in this District in the field of employment law."); *Carino v. Broadway & 166, LLC*, No. 10 Civ. 8506, Docket No. 35 at *4 (S.D.NY. May 1, 2013) (recognizing that Louis Pechman "used his considerable expertise in this wage and hour case to achieve an excellent result for the Class in a highly efficient manner"); *In re Chickie's and Pete's Wage and Hour Litigation*, No. 12 Civ. 6820, Docket Entry No. 80 at *1 (E.D. Pa. Mar. 28, 2013) (consolidating cases and appointing Louis Pechman as lead counsel); *Duchene v. Michael Cetta, Inc.*, No. 06 Civ. 4576, 2009 WL 5841175, at *2 (S.D.NY. Sept. 10, 2009) (recognizing Louis Pechman's "extensive experience in litigating wage and hour class actions").

64.    I serve as an Adjunct Professor at Fordham University School of Law, where I teach a course titled "Wage Theft: Employee Rights and Employer Responsibilities."  I speak frequently on employment law issues, with a focus on wage-and-hour topics.  Since 2010, I have moderated an annual program at the New York County Lawyers' Association on "How to Handle a Wage

and Hour Case," and I last moderated this program in November 2021. Every year since 2017, I have moderated a New York City Bar CLE-accredited program titled "FLSA Math: How to Calculate Wage-Related Damages." I was also Chair of the Restaurant and Hospitality Law Committee of the Bar of the City of New York from 2014 to 2017.

65.    PLG has been selected by Best Lawyers as a "Tier 1" New York City law firm in the areas of "Employment Law – Individuals" and "Employment Law – Management" every year since 2017.

66.    Galen C. Baynes, a partner at PLG working on this matter, received his J.D. degree *magna cum laude*, Order of the Coif, from Case Western Reserve University School of Law in May 2017, where he was a Frederick K. Cox International Law Center Fellow and senior editor of the Case Western Reserve University Law Review. He is a member in good standing of the New York and New Jersey State Bars and is admitted to practice in the United States District Court for the Southern District of New York, United States District Court for the Eastern District of New York, United States District Court for the District of New Jersey, and the Court of Appeals for the Second Circuit. Mr. Baynes began working as an associate at Pechman Law Group PLLC in November 2019 and was promoted to partner in September 2024. Prior to joining Pechman Law Group PLLC, Mr. Baynes served for two years as a law clerk to Chief Judge Wilma A. Lewis of the United States District Court of the Virgin Islands. Mr. Baynes has been actively involved in the litigation of dozens of wage and hour cases and routinely drafts pleadings, takes depositions, drafts and argues motions, and engages in settlement negotiations. Mr. Baynes is fluent in Spanish, Plaintiff's primary language.

67.    Camille A. Sanchez, an associate at PLG working on this matter, received her J.D. degree from St. John's University School of Law in June 2022, where she was the recipient of the

Graduate Public Service Award and the 2020 St. John's Public Interest Fellowship. She is a member in good standing of the New York and New Jersey State Bars and is admitted to practice in the United States District Court for the Southern District of New York, United States District Court for the Eastern District of New York, and the United States District Court for the District of New Jersey. Since joining PLG in August 2022 as an associate attorney, she has conducted client meetings, drafted discovery requests and responses, drafted and filed pleadings, attended depositions, and attended pretrial conferences, including settlement conferences. Ms. Sanchez is a native Spanish speaker, the language of Plaintiff.

68.     Rachell Henriquez received her J.D. degree from Benjamin N. Cardozo Law School in June 2023, where she served as staff editor in the Cardozo Journal of Equal Rights and Social Justice. Ms. Henriquez was admitted to New York Bar in June 2024. Since joining PLG in January 2024 as an associate attorney, she has conducted client meetings, drafted discovery requests and responses, drafted and filed pleadings, attended depositions, and attended pretrial conferences, including settlement conferences. Ms. Henriquez is a native Spanish speaker, the language of Plaintiff.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Dated:   New York, New York
          December 18, 2024

Louis Pechman